

EOD
09/29/2006

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| IN RE: § § | |
| WILLIAM A. TAYLOR, § § § | Case No. 05-41327 (Chapter 7) |
| Debtor. § | |

## MEMORANDUM OPINION AND ORDER[1]

This matter is before the Court on the *Objection to Homestead Exemption* (the "Objection") filed by C. Kent Adams and Lone Star Partners.[2] In the Objection, Mr. Adams and Lone Star Partners object to an attempt by William A. Taylor (the "Debtor" or "Mr. Taylor") to elevate a disputed claim to 145 acres owned by Lone Star Partners to an exempt homestead interest in the property. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law. *See* FED. R. BANKR. P. 7052 and 9014.

## JURISDICTION

An objection to a debtor's claimed exemptions is core matter over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(b)(2)(B).

## BACKGROUND

### Mr. Adams and the Debtor Form Lone Star Partners

On April 25, 1995, Mr. Adams and the Debtor executed a Partnership Agreement pursuant to which Lone Star Partners, a Texas general partnership, was created to

---

[1] This Memorandum Opinion is not designated for publication and shall not be considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, or the law of the case, or as to other evidentiary doctrines applicable to the specific parties in this proceeding.

[2] G. Kevin Buchanan and Buchanan & Burke, L.L.P., also filed an *Objection to Debtor's Homestead Exemption* on May 20, 2005. However, Mr. Buchanan and his law firm have agreed to withdraw their claim against the Debtor's estate in connection with a settlement agreement approved by this Court pursuant to a separate *Memorandum Opinion and Order* entered in this case on September 29, 2005. Since Mr. Buchanan and his law firm are no longer creditors of the Debtor's estate, their objection to the Debtor's homestead exemption is now moot.

"purchase, own, finance, lease and sell" approximately 1740 acres referred to as "Lone Star Ranch." The dispute involves, among other things, Section 17.10 of the Partnership Agreement, which provides as follows:

> William A. Taylor shall maintain the exclusive right and option to occupy and purchase a part of the partnership property for a price of $2,200 per acre for a period of 24 months from April 28, 1995. It is agreed that Taylor shall notify the partnership of his intent to exercise this option on or by September 1, 1995. It is further agreed that if Taylor elects to exercise this option, he shall be responsible for the interest accrued on that portion of the note from September 1, 1995 until he consummates the purchase and C. Kent Adams shall then have the immediate right and option to purchase the same amount of acreage at the same price, and on the same terms and conditions as Taylor.

At the hearing on the Objection, the Debtor testified that he never exercise the purchase option in writing.

According to the Debtor's testimony, prior to entering into the Partnership Agreement, he and Mr. Adams entered into an oral agreement that he would be permitted to purchase 377 acres of Lone Star Ranch. However, the Debtor's testimony regarding the alleged oral agreement was not credible. Moreover, his testimony is contradicted by Section 17.10 of the Partnership Agreement.

Lone Star Partners purchased Lone Star Ranch from F.O. Birmingham Memorial Land Trust in April 1995. In consideration for the sale, the seller received a $300,000 cash down payment and a non-recourse promissory note in the original principal amount of $3,500,000 (the "Birmingham Note"), secured by a vendor's lien retained in the deed to Lone Star Partners and a deed of trust lien pursuant to a deed of trust. Mr. Adams contributed $200,000.00 of the required cash down payment. The Debtor contributed $100,000 and issued a promissory note made payable to Mr. Adams in the original principal amount of $100,000.

Beginning at the inception of the partnership and continuing to at least November 13, 2000, the Debtor managed the day-to-day affairs of Lone Star Partners. During this period, property of Lone Star Partners, including houses and grazing pastures, was leased to third parties. These leases and other uses generated income for Lone Star Partners.

The Debtor testified that Lone Star Partners' property did not produce enough to pay all of Lone Star's monthly operating expenses. The Debtor testified that the average shortfall was $900 a month and that he used his own money to make up the shortfall. The Debtor also testified that he made principal and interest payments to F.O. Birmingham Memorial Land Trust and that he paid ad valorem taxes on the partnership's property. However, the Debtor produced no evidence of any such payments, other than his own testimony, and the Court did not find his testimony regarding payments of monthly shortfalls and property taxes to be credible.[3]

## The Debtor Moves onto the Partnership's Property

During late summer or early fall 1995, the Debtor moved into an old, existing house on Lone Star Partners' property. The Debtor began patching existing fences, repairing old roads, and remodeling the house. The Debtor married on December 15, 1995. He testified that he moved his wife's horse onto the property and, eventually, purchased several other horses. The Debtor also testified that he has leased portions of "his" 377 acres, which he testified are outlined by fences, for grazing. The Debtor and his wife continue to reside on the property.

---

[3] The Debtor and his wife produced no income from April 1995 through the summer of 2002. The Debtor testified that they lived off their savings and received financial assistance from family. Nonetheless, the Debtor testified – *not* credibly – that he contributed the total amount of $370,000 to Lone Star Partners' during this period.

3

Mr. Adams testified, credibly, that the house where the Debtor and his wife reside sits on less than one acre. The partnership has leased portions of the surrounding acreage for grazing. Mr. Adams also testified that he has repaired or torn down fence on the surrounding acreage and has had portions of the surrounding acreage mowed. Mr. Adams testified that he owns the water meter, has replaced the entry gate, and has paid all property taxes on the house and the surrounding property. The Debtor and his wife have never paid rent to Mr. Adams or Lone Star Partners.

### The Debtor Fails to Make Required Payments

Beginning in 1998, the partnership failed to generate sales sufficient to pay the annual loan payments due under the Birmingham Note. Therefore, pursuant to the terms of the Addendum to Lone Star Partners Partnership Agreement, the partners became responsible for making equal contributions to Lone Star Partners to pay the debt service. The Debtor, however, failed to pay his share of the amounts due under the Birmingham Note. The Debtor and Mr. Adams entered into letter agreements dated November 6, 1998 and November 6, 2000, pursuant to which Mr. Adams made the full amount of the loan payments. Mr. Adams likewise paid the entire amounts due under the Birmingham Note in 1999, 2000 and 2001.

On December 20, 2001, Mr. Adams sent the Debtor a letter regarding a "Notice of Election Pursuant to Paragraph 12.20" of the Partnership Agreement. In the letter, Mr. Adams informed the Debtor that he was in default of his obligation to pay one-half of the interest payment due to the mortgage holder on November 6, 2001. On January 23, 2002, Mr. Adams sent the Debtor a letter notifying him that Mr. Adams was exercising the

option contained in Paragraph 12.02 of the Partnership Agreement to terminate the the Debtor's interest in Lone Star Partners.

### The Debtor Sues Mr. Adams and Lone Star Partners

In 1999, the Debtor filed a lawsuit in Texas state court against Mr. Adams and Lone Star Partners regarding the affairs and actions of Lone Star Partners. Kevin Buchanan and Buchanan & Burke, L.L.P., initially represented the Debtor. The parties refer to this action as the "Partnership Lawsuit."

In March 2002, the Debtor filed a malpractice action in Texas state court against Mr. Adams, who is an attorney, and Mr. Adams' law firm. The parties refer to this lawsuit as the "Malpractice Lawsuit." Additionally, in April 2002, the Debtor filed a complaint in the United States District Court for the Eastern District of Texas against numerous entities alleging that they had infringed on the Debtor's trademark – "LoneStar Ranch." The parties refer to this action as the "Trademark Lawsuit."[4]

### The Debtor and Mr. Adams Sign a Rule 11 Agreement

On June 19, 2002, the Debtor and Mr. Adams entered into a Rule 11 Agreement in the Partnership Lawsuit. The Rule 11 Agreement designated Mr. Adams as the sole representative of Lone Star Partners until the final decision by an arbitration tribunal or June 1, 2003, whichever came first. Among other things, the Rule 11 Agreement stated that "Taylor shall continue to have the use and enjoyment of his present residence and the plus or minus 145 acres surrounding during the term of this Rule 11 Agreement without the necessity of the payment of rent to the Partnership," subject to the condition that the Debtor would be required to vacate the property in the event it was sold. The Rule 11

---

[4] The Debtor's claims in the Trademark Lawsuit were unsuccessful, and the United States District Court for the Eastern District of Texas closed the case in May 2003.

5

Agreement also removed a *Notice of Lis Pendens* filed by the Debtor on March 11, 2002, on the real property owned by Lone Star Partners.

Based upon the Rule 11 Agreement, Mr. Adams and Lone Star marketed the partnership's property and obtained at least 11 contracts of sale, including a contract for nearly $1,000,000.00 that included the 145-acre tract. The Debtor filed a second *Notice of Lis Pendens* on December 10, 2002, even though Lone Star Partners explicitly had the right to sell the 145-acre tract under the Rule 11 Agreement. The Debtor's second lis pendens jeopardized at least six pending contracts of sale. Additionally, after the Debtor filed a second lis pendens in violation of the Rule 11 Agreement, the Debtor's then counsel-of-record, Kevin Buchanan and Buchanan & Burke, L.L.P., sought to withdraw from their representation of the Debtor.

### Mrs. Taylor Sues Mr. Adams and Lone Star Partners

On December 17, 2002, Mrs. Taylor filed an action against Mr. Adams and Lone Star Partners in Dallas County Court at Law No. 3. Mrs. Taylor served Mr. Adams with the lawsuit more the two years later, in or around March 2004. Mrs. Taylor is represented by Bill C. Hunter in this lawsuit, which the parties refer to as the "Specific Performance Lawsuit." In her complaint, as amended, Mrs. Taylor seeks a declaratory judgment that she and her husband had a right in the property upon which they are living that is superior to the right of the partnership and Mr. Adams. Mrs. Taylor also seeks to enforce the alleged oral agreement allowing her husband to purchase 377.222 acres of Lone Star Ranch.

### The Debtor and Mr. Adams Sign a Settlement Agreement

On December 18, 2002, the Debtor and Mr. Adams met to discuss settling the

Partnership Lawsuit. The Debtor was represented by Mr. Hunter as well as Mr. Buchanan during these negotiations. Mr. Hunter left the negotiations at approximately 11:30 p.m., while Mr. Buchanan stayed until an agreement was reached at around 6:00 a.m. on December 19, 2002.

The ultimate product of these negotiations was a document entitled "Settlement Agreement." Mr. Adams and the Debtor executed the five-page Settlement Agreement on December 19, 2002. The December 19th Settlement Agreement provides, among other things, that the Debtor will receive between 16% and 25% from the net proceeds of the sale of certain real property belonging to Lone Star Partners as well as cash payments from Mr. Adams and Lone Star Partners. The December 19th Settlement Agreement also provides that Lone Star Partners will sell 145 acres to the Debtor "pursuant to the option heretofore granted" under certain terms and conditions. The sales price for the land is $2,200 per acre "to be evidenced by a promissory note bearing interest at nine point five (9.5%) simple interest per annum and having a final maturity date of August 1, 2005." In exchange, the Debtor will, among other things, release Mr. Adams from any claim asserted (or that could have been asserted) in the Malpractice Lawsuit and dismiss the Partnership Lawsuit with prejudice.

The last paragraph of the December 19th Settlement Agreement states: "The parties agree to draft and sign more comprehensive documents to fully implement the purpose and intent of this Agreement not later than December 31, 2002." Counsel for Mr. Adams drafted the referenced documents and provided them to Mr. Buchanan and Mr. Hunter. The documents, however, were not signed by December 31, 2002.

On January 13, 2003, Mr. Hunter met with Mr. Boyd, counsel for Mr. Adams. Mr. Hunter indicated to Mr. Boyd that he wanted to make some changes to the December 19th Settlement Agreement. Mr. Boyd testified that he believed these changes to be "fairly significant." Mr. Boyd testified that, by the time he left that meeting, he did not believe the Debtor intended to comply with the December 19th Settlement Agreement unless Mr. Adams agreed to material changes.

In January, February and March 2003, Mr. Adams wrote several checks to the Debtor and Mr. Buchanan pursuant to the schedule of payments set forth in the December 19th Settlement Agreement. In addition to the checks written by Mr. Adams on the partnership account, Mr. Adams directed the title company to send several checks to the Debtor from the proceeds of several sales of the partnership's property. Mr. Buchanan, who at that time was still counsel of record for the Debtor, assured Mr. Adams that he would not allow the checks to be cashed until the Debtor had dismissed the Partnership Lawsuit and the Malpractice Lawsuit.

In March 2003, Mr. Buchanan and Buchanan & Burke, L.L.P., withdrew as the Debtor's attorney. On May 2, 2003, Bill Hunter (for the Debtor) and Kevin Buchanan (for Buchanan & Burke, L.L.P.) appeared and announced to the court in the Partnership Lawsuit that they had reached a settlement regarding various disputes. Among other things, the checks that had been tendered by Mr. Adams and Lone Star Partners would be endorsed by Buchanan & Burke, L.L.P., and delivered to Mr. Hunter. Mr. Hunter was to (1) hold the checks until a resolution was reached between the Debtor and Mr. Adams, or (2) return the checks to Mr. Adams' counsel.

One of the conditions in the December 19th Settlement Agreement for the transfer of 145 acres to the Debtor was that: "[Mr. Taylor] shall designate and survey the Transferred Land within ninety (90) days of the execution of this Agreement subject to the agreement of . . . [Mr. Adams and Lone Star Partners] . . . ." The Debtor, however, did not provide Mr. Adams with a survey of the 145 acres until June 2003. The survey eventually provided by the Debtor included 149 acres rather than 145 acres.

Mr. Adams and Lone Star Partners filed various motions in the Partnership Lawsuit seeking to enforce the December 19th Settlement Agreement. The Debtor opposed these motions. For example, on August 27, 2003, Mr. Hunter, as the attorney for the Debtor, filed *Taylor's Response to Defendants' Amended Motion to Confirm and Compel Settlement and to Dismiss Action With Prejudice* in the Partnership Lawsuit. In this document, Mr. Hunter stated that "Taylor has withdrawn his approval" to the December 19th Settlement Agreement, and he argued that the December 19th Settlement Agreement "cannot be enforced because it is incomplete as well as vague and/or ambiguous in material particulars . . . ." On the same day, Mr. Hunter filed *Taylor's Response to Defendants' Alternative Motion to Confirm and Compel Settlement and to Dismiss Action With Prejudice* in which he made substantially similar arguments.[5]

### The Debtor Files for Bankruptcy

The Partnership Lawsuit was scheduled for trial on March 21, 2005. On the day before trial, the Debtor filed a petition for relief in this Court under Chapter 11 of the

---

[5] Prior to filing these objections, Mr. Taylor relied on the enforceability of the December 19th Settlement Agreement in connection with the Trademark Lawsuit. In an affidavit executed by Mr. Taylor on January 27, 2003, in support of an objection to a motion for summary judgment, Mr. Taylor asserted that Lone Star Partners had disclaimed any interest in the mark "Lone Star Partners" in favor of Mr. Taylor pursuant to the December 19th Settlement Agreement.

9

Bankruptcy Code. On the eve of the trial of the Partnership Lawsuit by this Court, the Debtor converted his case from Chapter 11 to Chapter 7.

In his Schedule A, Real Property, the Debtor asserts the following interest in 145 acres of Lone Star Partners' property:

> claim to rural homestead in 145 acres or more in and around 4360 County 177, Celina, Colin County, Texas and part of 377 acres out of the James Hefflefinger Survey Abstract 366, the Joesph [sic] Mitcm Survey, Abstract 590, and the John L White Survey Abstract 1014. See attached schedule notes.

The attached notes to the Debtor's schedules explain that his claimed interest in the 145 acres derives from the December 19th Settlement Agreement in the Partnership Lawsuit or, alternatively, from the Specific Performance Lawsuit.

In his Schedule B, Personal Property, the Debtor lists a partnership interest in Lone Star Partners. In the notes attached to his bankruptcy schedules, the Debtor claims a 50% interest in Lone Star Partners. Likewise, in his Statement of Financial Affairs, the Debtor states that he was a general partner in Lone Star Partners as of the petition date.

In his Schedule C, Property Claimed as Exempt, the Debtor designates his claimed interest in Lone Star Partners' 145 acres as exempt property pursuant to article 16, sections 50 and 51 of the Texas Constitution and sections 41.001 and 41.002 of the Texas Property Code. In their Objection to the Debtor's exemptions, Mr. Adams and Lone Star Partners assert that, since the Debtor does not own the 145 acres, he may not claim the 145 acres as his exempt homestead. To the extent The Debtor's claimed interest in the 145 acres is based on the December 19th Settlement Agreement, the Debtor and Lone Star Partners point out that the Debtor has disputed the validity of that agreement and, in any event, they argue that the option to purchase 145 acres pursuant to

the December 19th Settlement Agreement has expired. Mr. Adams and Lone Star Partners also argue that a partner cannot claim a homestead interest in partnership property under Texas law.

## Discussion

Filing a voluntary petition in bankruptcy creates a bankruptcy estate. Property of that estate is defined by 11 U.S.C. § 541. Legislative history shows that Congress intended § 541 to be interpreted broadly. The House and Senate Reports stated:

> Under paragraph (1) of subsection (a), the estate is comprised of all legal or equitable interest of the debtor in property, wherever located, as of the commencement of the case. The scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, [and] causes of action···· The debtor's interest in property also includes "title" to property, which is an interest, just as are a possessory interest, or leasehold interest, for example.

*In re Canon*, 130 B.R. 748, 750 (Bankr. N.D. Tex. 1991) (citing S. Rep. No. 989, 95th Cong., 2d Sess. 82 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess. 367 (1977), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5868, 6323)).[6]

A debtor is permitted to "exempt" certain property from the bankruptcy estate. *See* 11 U.S.C. § 522. The U.S. Supreme Court has described an exemption as "an interest withdrawn from the estate (and hence from creditors) for the benefit of the debtor." *Owen v. Owen*, 500 U.S. 305, 308 (1991). A debtor's claim of exemption is presumptively valid. *See* 11 U.S.C. §522(l).

---

[6] There has been some confusion among the parties at hearings before this Court regarding what constitutes "property of the estate" within the meaning of 11 U.S.C. § 541. The Debtor asserts a *claim* to 145 acres owned by Lone Star Partners. However, property does not become "property of the estate" within the meaning of § 541 simply because the Debtor asserts a claim to the property. The Fifth Circuit's opinion in *In re Chesnut*, 422 F.3d 298 (5th Cir. 2005) does not state otherwise. Rather, the Fifth Circuit held in *Chesnut* that a "creditor violates the stay if, without permission of the bankruptcy court, he forecloses on an asset to which the debtor has only an arguable claim of right." *Id.* at 300. The Fifth Circuit reasoned that bankruptcy law "demands some process prior to the seizure of arguable property ...." *Id.* at 304. "Whether an asset is property of the estate is a legal determination which frequently entails complex analyses involving a number of legal elements and a variety of facts." *Id.* at 303.

11

Bankruptcy Rule 4003(b) provides that any party in interest may object to a debtor's claimed exemptions within thirty days after the conclusion of the meeting of creditors held under Bankruptcy Rule 2003(a). A debtor is not required to make an affirmative showing that a claimed exemption is appropriate in response to such an objection -- the debtor need only characterize the claimed exemption as falling within an exempt category. *See, e.g., In re Lester,* 141 B.R. 157, 161 (S.D. Ohio 1991). The objecting party, which has the burden of proof, must produce evidence which "rebuts the *prima facie* effect of the claimed exemption." *Id.*; *see also* FED. R. BANKR. P. 4003(c).

### Homestead Interests in Partnership Property

In 1886 the Texas Supreme Court determined that a homestead could be claimed in partnership property, stating:

> In the absence of definitive legislation to guide us, and in obedience to the progressive tendency adverted to, we hold, against the preponderance of authority, but with the preponderance of reason, that a partner in a solvent firm may designate his interest in partnership realty as a part of his homestead, and thus secure it from forced sale.

*Swearingen & Garrett v. Bassett,* 65 Tex. 267, 273 (1886). That holding was followed for many years. *See, e.g., Postal Savings & Loan v. Powell* 47 S.W.2d 343, 351 (Tex.Civ.App. -- El Paso 1932, writ ref'd).

The applicability of these older cases was brought into question by the adoption in Texas of the Uniform Partnership Act, the Uniform Limited Partnership Act and their successors. *See In re Brooks,* 103 B.R. 123, 125-26 (Bankr. S.D. Tex. 1988). In *Brooks*, the bankruptcy court explained that "the adoption of the Texas Uniform Partnership Act in 1962 and the subsequent case law make it clear that individuals have no claim to a homestead interest (business or otherwise) in partnership property." *Id.* The Texas

Uniform Partnership Act specifically provides that "[a] partner or partner's spouse does not have an interest in partnership property." *See* TEX. BUS. ORG. CODE §152.101.

Here, the Debtor states in his bankruptcy schedules and Statement of Financial Affairs that he was partner in Lone Star Partners when he filed his bankruptcy petition.[7] The 145 acres described in his Schedule C are owned by Lone Star Partners. The Debtor, as a partner in Lone Star Partners, cannot claim property belonging to the partnership as his exempt property under Texas law. *See, e.g., In re Cooper*, 128 B.R. 632, 636 (Bankr. E.D. Tex. 1991) (following *Brooks* and holding that debtor-partner could not claim office real property belonging to partnership as office homestead exempt property under Texas law); *In re Cole*, 205 B.R. 382, 386 (Bankr. E.D. Tex. 1997) (citing *Brooks* and holding that partners may not claim a homestead interest in partnership property).

### Possessory Interests in Real Property

Even if the Court were to determine, under the peculiar facts of this case, that the Debtor was not a partner in Lone Star Partners as of the petition date, Mr. Adams and Lone Star Partners argue that the Debtor does not have an exempt homestead interest in the 145 acres under Texas law. Texas law defines a "homestead" as an interest in real property. *See* TEX. CONST. art. XVI, § 50; TEX. PROP. CODE § 41.002; TEX. TAX CODE §11.13(j)(1). The Debtor did not, as of the petition date, have any ownership interest in the 145 acres described in his bankruptcy schedules. *See Owen*, 500 U.S. at 314 n.6 ("The proper date for determining whether an exemption exists is, in the usual case, the

---

[7] The Debtor made the statements in his bankruptcy schedules and Statement of Financial Affairs under oath. *See* FED. R. BANKR. P. 1008.

13

date of filing of the bankruptcy petition.").[8]

The Debtor argues that it is not necessary to own property in order to claim a homestead interest in that property under Texas law. Indeed, there is some authority that mere possession is enough to sustain a claim of homestead under Texas law. *See* 43 TEX. JUR. 3d, *Homesteads*, § 45 (collecting cases). However, a homestead claimant, "having naked possession without any title . . . may maintain [his] claim of homestead against all creditors *save the true owner or one having better title.*" *Shepler v. Kubena*, 563 S.W.2d 382, 386 (Tex. Civ. App. – Austin, 1978.) (emphasis added).

The Court recognizes that homesteads are "favorites of the law" and that liberal construction must be given to the constitutional and statutory provisions that protect homestead exemptions. *See Bradley v. Pacific Southwest Bank (In re Bradley)*, 960 F.2d 502, 507 (5th Cir. 1992). In this case, however, it is the true owner of the 145 acres who objects to the Debtor's claimed homestead interest in the 145 acres. Thus, while the Debtor may have a possessory interest in the 145 acres, his claim of homestead may not be maintained as to Lone Star Partners.

Alternatively, the Debtor asserts that he has adversely possessed the 145 acres since moving onto the property in 1995. Adverse possession is defined as "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person" throughout the statutory period. TEX. CIV. PRAC. & REM. CODE §16.021(1). Exclusive possession of the land is required to support an adverse possession claim; the adverse possession claimant

---

[8] Mr. Adams and Lone Star Partners argue that, at best, Mr. Taylor was a tenant-at-sufferance following his termination as a partner in Lone Star Partners. A tenant at sufferance is defined as "[a] tenant who has been in lawful possession of property and wrongfully remains as a holdover after the tenant's interest has expired." BLACK'S LAW DICTIONARY (8th ed. 2004)

must wholly exclude the owner of the property. *See, e.g., Terrill v. Tuckness,* 985 S.W.2d 97, 107 (Tex.App.-San Antonio 1998, no pet.); *Kleckner v. McClure,* 524 S.W.2d 608, 613 (Tex.Civ.App.-Fort Worth 1975, no writ).

Here, the Debtor claims to have been a partner in Lone Star Partners when he filed his bankruptcy petition. As a partner, the Debtor "may use or possess partnership property only on behalf of the partnership." TEX. BUS. ORG. CODE §152.203(b). Even if the Debtor's partnership interest has been terminated, as Mr. Adams contends, less than ten years have passed since the termination. *See* TEX. CIV. PRAC. & REM. CODE §§ 16.026 (ten-year limitations period) and 16.027 (25-year limitations period). Further, it was clear from Mr. Adams' testimony regarding his activities on the 145 acres that he was not excluded from the property, and the Debtor's right to possess the property has been the subject of litigation for years. Under these circumstances, the Debtor has not "adversely possessed" the 145 acres under Texas law.

Additionally, with respect to the Debtor's testimony that he patched up fences on the 377 acres and leased the property for grazing, the law is well settled that the mere grazing of land incidentally enclosed by a fence created by others cannot support a claim of adverse possession. *McDonnold v. Weinacht,* 465 S.W.2d 136, 142 (Tex. 1971); *West Production Co. v. Kahanek,* 121 S.W.2d 328, 331 (Tex. 1938); *Mohnke v. Greenwood,* 915 S.W.2d 585, 593 (Tex.App.-Houston [14th Dist.] 1996, no writ). Where the fence existed prior to the claimant's possession of the land and the claimant fails to demonstrate the purpose for which the fence was erected, the fence is a "casual fence." *Rhodes v. Cahill,* 802 S.W.2d 643, 645 (Tex. 1990). Repairing or maintaining a casual fence, even for the express purpose of keeping the claimant's animals within the enclosed area,

generally does not change a casual fence into a designed enclosure. *Id.*

## The December 19th Settlement Agreement

Finally, the Debtor asserts that the December 19th Settlement Agreement is enforceable and that it includes a contract for the sale of the 145 acres to him. Mr. Adams and Lone Star Partners point out that the Debtor has denied the enforceability of the December 19th Settlement Agreement. Additionally, Mr. Adams and Lone Star Partners claim that, having failed make to comply with the December 19th Settlement Agreement, Mr. Taylor may not now seek to enforce it to his advantage.

As an initial matter, the Court finds and concludes that the December 19th Settlement Agreement is ***not*** an enforceable contract. At the hearing on August 17, 2005, Mr. Hunter, the Debtor's former attorney, testified as to numerous issues that the December 19th Settlement Agreement failed to resolve. The Debtor's motions have described the December 19th Settlement Agreement as materially deficient and he has withdrawn his consent to the agreement. Further, the December 19th Settlement Agreement does not describe the 145 acres proposed to be transferred to the Debtor, and the survey eventually provided by the Debtor included 149 acres rather than 145 acres. The Court, therefore, finds that there has been no "meeting of the minds" with respect to the terms of the settlement. *See Hubbard v. Shankle,* 138 S.W.3d 474, 481 (Tex.App. - Ft. Worth 2004, writ denied) (discussing the elements of an enforceable contract under Texas law).[9]

The December 19th Settlement Agreement is, at best, an unsuccessful attempt by the parties to form an "agreement to agree." The Fifth Circuit discussed the

---

[9] In this regard, it is noteworthy that, at the conclusion of the hearing on August 30, 2005, the Court "put the parties to the test" and suggested that the parties should meet and attempt to "finalize" the Settlement Agreement. The parties were unable to reach an agreement

enforceability of "agreements to agree" under Texas law in *Geraghty and Miller, Inc. v. Conoco Inc.*, 234 F.3d 917 (5th Cir. 2000), as follows: "Under Texas law, parties may agree on certain contractual terms, understanding them to be an agreement, while leaving other terms open for future negotiation. *Id.* at 930 (citing *Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554, 555 (Tex.1972)). The Fifth Circuit described "two essential elements that must be satisfied for this kind of contract to be enforceable. First, the contract must be sufficiently definite in its terms so that a court can understand the promises made. Second, all material terms of the contract must be agreed upon." *Id.* at fn. 10 (citing *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.1992)).

Assuming (for the sake of argument) the December 19th Settlement Agreement is somehow enforceable, the Court must consider whether the December 19th Settlement Agreement is an "executory contract." Although the Bankruptcy Code does not define "executory contract," the relevant inquiry is whether performance remains due to some extent on both sides. "Courts applying §365(a) have indicated that an agreement is executory if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *Matter of Murexco Petroleum, Inc.*, 15 F.3d 60, 62-63 (5th Cir. 1994). Courts have frequently applied this analysis to settlement agreements. *See, e.g., In re Columbia Gas System, Inc.*, 50 F.3d 233 (3d Cir. 1995).

In this case, the Court finds and concludes that the December 19th Settlement Agreement, if enforceable, is an executory contract. Both parties had obligations due and owing under the December 19th Settlement Agreement as of the petition date. Among other things, none of the documents referenced in the agreement had been signed; the

Debtor had not yet dismissed the Malpractice Lawsuit or the Partnership Lawsuit; and Lone Star Partners and Mr. Adams had not tendered the full amount owed to Mr. Taylor pursuant to the agreement. Further, the fact that the Debtor and Lone Star Partners filed motions seeking to enforce the December 19th Settlement Agreement indicates that there has been a lack of performance by Mr. Taylor which has resulted in a material breach. *See, e.g., In re Walnut Assoc.,* 145 B.R. 489 (Bankr. E.D. Pa. 1992) (concluding that settlement agreement was executory).

An "executory contract" such as the December 19th Settlement Agreement may be assumed or rejected pursuant to §365(a) of the Bankruptcy Code. However, in a chapter 7 case, the chapter 7 trustee must assume an executory contract within 60 days of the petition date or date of conversion, or the contract is deemed rejected. *See* 11 U.S.C. §§ 348(a) and 365(d)(1). The rejection of an executory contract gives rise to a legal fiction that a breach of the contract occurred immediately prior to the filing of the petition. *See* 11 U.S.C. § 365(g)(1). Under Texas law, when a party to a contract fails to perform his obligations under the contract, he may not thereafter enforce the remaining terms of the contract. *See, e.g., Atl. Richfield Co. v. Long Trusts,* 860 S.W.2d 439, 447 (Tex.App.-Texarkana 1993, writ denied). Thus, in this case, the Court finds and concludes that the December 19th Settlement Agreement (if enforceable at all) is a rejected, executory contract that the debtor may not now seek to enforce.

Assuming (again, for the sake of argument) that the December 19th Settlement Agreement is an enforceable, non-executory contract (or an executory contract that has been assumed), the Debtor has not complied with the terms of the agreement. Among other things, the Debtor did not provide a survey to Mr. Adams within the time set forth

in the agreement. The Debtor also has not paid Mr. Adams or Lone Star Partners the $2,200 per acre described in the December 19th Settlement Agreement.

The Debtor next argues that the December 19th Settlement Agreement contains an enforceable "contract for deed" under Texas law. A contract for deed is an agreement by a seller to deliver a deed to property once certain conditions have been met. *See* 63 TEX. JUR. 3d., *Real Estate Sales*, §2 (Generally, definitions – Contract to sell; contract for deed). "These contracts, also referred to as 'land sale contracts' or 'contracts of sale' typically provide that upon making of a down payment, the buyer is entitled to immediate possession of the property; however, title remains in the seller until the purchase price is paid in full. The purchase price is typically paid in installments over a course of years." *Graves v.. Diehl,* 958 S.W.2d 468, 470-71 (Tex.App.-Houston [14th Dist.] 1997, no pet.).

The statute of frauds requires an agreement for the conveyance of land to be in writing and signed by the party to be charged. *See also* TEX. BUS. & COM. CODE § 26.01. The required writing must contain all the essential terms of a contract, expressed with such clarity and certainty that it may be understood without resort to parole evidence. *Pick v. Bartel,* 659 S.W.2d 636, 637 (Tex. 1983). One of the essential elements of a contract for the sale of land is a reasonably certain description of the land to be conveyed. A written agreement for the conveyance of land is void if it does not contain a sufficient legal description of the property. *See City of Austin v. Jamail,* 555 S.W.2d 150, 151 (Tex.Civ.App.-Austin, 1977, writ ref'd n.r.e.). "To be sufficient, the writing must furnish within itself, or by reference to some other *existing writing*, the means or data by which the land to be conveyed may be identified with reasonable certainty." *Morrow v. Shotwell,* 477 S.W.2d 538, 539 (Tex. 1972) (emphasis added).

Here, the December 19th Settlement Agreement does not contain any description of the as-yet-undesignated 145 acre tract. The December 19th Settlement Agreement, therefore, falls within the Texas statute of frauds. To the extent the Debtor seeks to use partial performance as a defense to the statute of frauds, he failed to establish any such performance – among other things, he has made no payments to Mr. Adams or Lone Star Partners relating to what he describes as the "contract for deed" and he has not executed the promissory note described in the December 19th Settlement Agreement. He was already living on the property when he signed the December 19th Settlement Agreement, and his continued residence there was not based on the December 19th Settlement Agreement (which he has claimed is unenforceable). *See Kronenberger v. Beke*, 517 S.W.2d 664, 667 (Tex.Civ.App.--Houston [1st Dist.] 1974, writ ref'd, n.r.e.). (There must be performance unequivocally referable to the agreement ....") (citations omitted).

## CONCLUSION

For the above stated reasons, the Court finds and concludes that Mr. Adams and Lone Star Partners have rebutted the *prima facie* validity of the Debtor's homestead exemption. The Court further finds and concludes that the Debtor does not have an exempt homestead interest in the 145 acres described in his bankruptcy schedules.

**IT IS THEREFORE ORDERED** that the Objection by Mr. Adams and Lone Star Partners shall be, and it his hereby, **SUSTAINED,** and the Debtor's exemption of a claim to the 145 acres is hereby **DISALLOWED**.

Signed on September 29, 2006,

*Brenda T. Rhoades*
HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE