

**EOD**

09/29/2006

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| WILLIAM A. TAYLOR, | § | Case No. 05-41327 |
| | § | (Chapter 7) |
| Debtor. | § | |

## MEMORANDUM OPINION AND ORDER[1]

Linda Payne, the chapter 7 trustee of the bankruptcy estate of William A. Taylor, the debtor, moves the Court to approve a global settlement with Kent Adams and Lone Star Partners pursuant to Bankruptcy Rule 9019. The global settlement, if approved, will result in a 100% distribution to creditors and a significant distribution to the debtor. The debtor, the debtor's wife (Laura K. Taylor), and the debtor's former attorney in his capacity as a creditor (Bill C. Hunter, P.C.) (collectively, the "Objecting Parties") oppose the trustee's motion. The Court conducted an evidentiary hearing on the trustee's motion on May 31 and June 26, 2006.

### I. Jurisdiction

A motion by a trustee under Bankruptcy Rule 9019 raises a core matter over which this Court has jurisdiction to enter a final order pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B) (C) and (O) and 1334. This Memorandum Opinion contains the Court's findings of fact and conclusions of law. *See* FED. R. BANKR. P. 7052 and 9014.

### II. Standards for Approval of Settlement Agreements

A bankruptcy court should approve a settlement under Bankruptcy Rule 9019 if

---

[1] This Memorandum Opinion is not designated for publication and shall not be considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, or the law of the case, or as to other evidentiary doctrines applicable to the specific parties in this proceeding.

the settlement is within a range of reasonableness, fair and equitable, and in the best interest of the bankruptcy estate. In making that determination, a bankruptcy court must make a well-informed decision, comparing the terms of the compromise with the likely rewards of litigation. The court must evaluate (1) the probability of success in the litigation with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and (3) all other factors bearing on the wisdom of the compromise. Under the first factor, the court does not conduct a mini-trial, but the court does apprise itself of the relevant facts and law to make an informed decision. *See Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980). Under the third category, the court should consider the best interest of creditors, with proper deference to their reasonable views. *See In re Cajun Elec. Power Co-op, Inc.*, 119 F.3d 349, 356 (5th Cir. 1997).

In this case, the trustee proposes to resolve pending litigation initially brought by the debtor (both pre-petition and post-petition) against Kent Adams and Lone Star Partners as well as the counterclaims asserted therein. The Court is familiar with the dispute between the parties and the pending claims the trustee seeks to settle.[2] The Court has heard many hours of heavily contested hearings regarding, among other things, a motion by the debtor seeking turnover of funds he alleged to be due under the December 19th Settlement Agreement as well as objections to the debtor's claimed exemptions.

---

[2] A court may take judicial notice of related proceedings and records in cases before the same court. *See Missionary Baptist Foundation of America v. Huffman*, 712 F.2d 206, 211 (5th Cir. 1983); *State of Florida Board of Trustees of the International Improvement Trust Fund v. Charley Toppino and Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975). *See also* FED. R. BANKR. P. 9017 ("The Federal Rules of Evidence . . . apply in cases under the Code.").

**MEMORANDUM OPINION AND ORDER – Page 2**

### III. The Proposed Settlement Agreement

Under the proposed global settlement, Mr. Adams and Lone Star Partners propose to (i) pay the trustee $250,000 and (ii) release their claims against the debtor's estate in the amount of $361,873.00. Additionally, contingent upon approval of the proposed settlement, Buchanan & Burke, L.L.P., will withdraw its claim against the debtor's estate in the amount of $240,000. In exchange, the trustee will enter into agreed judgments with Mr. Adams and Lone Star Partners in each of the pending lawsuits. The trustee also will assign any and all of the estate's claims and causes of action relating to Mr. Adams and Lone Star Partners as well as any right, title and interest the estate may have in Lone Star Partners or property held or owned by Mr. Adams or Lone Star Partners.

The debtor, Mrs. Taylor and Bill C. Hunter, P.C., object to the proposed settlement. They contend that the proposed settlement yields too little to the estate and argue that the trustee should insist upon a more substantial settlement payment by Mr. Adams and Lone Star Partners or pursue the pending litigation.[3] As an alternative to the proposed global settlement, Mrs. Taylor proposes to purchase what she describes as assets of the bankruptcy estate.

### IV. Background

Linda Payne was appointed the chapter 7 trustee to administer an estate of a debtor whose assets consist primarily of causes of action against his business partner (or former business partner) and the partnership. The multiple lawsuits arise out of a

---

[3] At the hearing on the trustee's motion, creditor Bill C. Hunter, P.C., and the debtor's wife also contended that the matters that are the subject of the proposed settlement are moot, because the matters were previously settled pursuant to a document entitled "Settlement Agreement" dated December 19, 2002. Because the Chapter 7 trustee's proposed settlement agreement would settle (among other things) matters beyond the scope of the 2002 "Settlement Agreement" as well as a dispute before this Court regarding the enforceability, validity and terms of the 2002 "Settlement Agreement," the Court denied the mootness objections at the hearing on the trustee's Bankruptcy Rule 9019 motion.

MEMORANDUM OPINION AND ORDER – Page 3

partnership agreement between the debtor and Mr. Adams dated April 25, 1995. Lone Star Partners was created pursuant to the partnership agreement to "purchase, own, finance, lease and sell" approximately 1740 acres referred to as "Lone Star Ranch."

Lone Star Partners purchased Lone Star Ranch from F.O. Birmingham Memorial Land Trust in April 1995. In consideration for the sale, the seller received a $300,000 cash down payment and a non-recourse promissory note in the original principal amount of $3,500,000 (the "Birmingham Note"), secured by a vendor's lien retained in the deed to Lone Star Partners and a deed of trust lien pursuant to a deed of trust. Of the $300,000 down payment, Mr. Adams contributed $200,000, and the debtor contributed $100,000. In addition, the debtor issued a promissory note made payable to Mr. Adams on April 28, 1996, in the original principal amount of $100,000 with interest at the maximum non-usurious rate allowed by Texas law.

Beginning in 1998, the partnership failed to generate sales sufficient to pay the annual loan payments due under the Birmingham Note. Therefore, pursuant to the terms of the "Addendum to Lone Star Partners Partnership Agreement," the partners became responsible for making equal contributions to Lone Star Partners to pay the debt service. The debtor, however, failed to make his share of the payments required under the Birmingham Note. The debtor and Mr. Adams thereafter entered into letter agreements dated November 6, 1998 and November 6, 2000, and Mr. Adams made the full amount of the loan payments.

### A. The Lawsuits

On March 11, 2002, the debtor filed the first of several lawsuits against Mr. Adams and Lone Star Partners, asserting various causes of action based on the affairs and

actions of Mr. Adams and Lone Star Partners. At the hearing before this Court, the parties referred to this action as the "Partnership Lawsuit." Kevin Buchanan and Buchanan & Burke, L.L.P., initially represented the debtor in the Partnership Lawsuit.

In his complaint, as amended, the debtor seeks monetary damages based on allegations that Mr. Adams breached the partnership agreement, breached his fiduciary obligations to the debtor as a partner, withheld profits from the partnership, converted partnership assets, and breached his duty not to compete with the partnership. In his counterclaims, as amended, Mr. Adams seeks a declaratory judgment as well as damages for the debtor's alleged breach of the December 19th Settlement Agreement (discussed below). Mr. Adams alternatively seeks damages for the debtor's alleged failure to pay any portion of the $100,000 promissory note to Mr. Adams, breach of the partnership agreement and subsequent letter agreements, and breach of the debtor's fiduciary duties to Mr. Adams and Lone Star Partners.

In addition to the Partnership Lawsuit, on or about March 11, 2002, the debtor filed suit against Mr. Adams, who is an attorney, and his law firm. The debtor asserts in his complaint, as amended and supplemented, that Mr. Adams violated the Texas Rules of Professional Conduct by entering into transactions with him that were "unfair and unreasonable." At the hearing before this Court, the parties referred to this action as the "Malpractice Lawsuit."

Approximately nine months later, in December 2002, Mrs. Taylor filed an action against Mr. Adams and Lone Star Partners seeking to force Mr. Adams and Lone Star Partners to perform an alleged oral agreement with her husband (*i.e.*, the debtor) to convey approximately 377 acres of real property to her husband. The lawsuit did not

**MEMORANDUM OPINION AND ORDER – Page 5**

specifically identify the 377 acres that were the subject of the alleged oral agreement. Mr. Hunter, who began representing Mrs. Taylor on approximately December 12, 2002, filed the lawsuit on her behalf. The debtor subsequently joined his wife as a plaintiff in what the parties referred to as the "Specific Performance Lawsuit."

## B. Pre-Bankruptcy Settlement Efforts

In connection with the Partnership Lawsuit, the debtor and Mr. Adams attended several mediations sessions. In or around June 2002, the parties mediated a dispute regarding a lis pendens filed by the debtor against the partnership's property. A third mediation session was subsequently conducted in an effort to settle the case in its entirety; however, no agreement was reached. In December 2002, after the debtor filed another lis pendens against the partnership's property, the state court directed the parties to attend a fourth mediation session.

On December 19, 2002, the debtor and Mr. Adams executed a document entitled "Settlement Agreement." The December 19th Settlement Agreement provides, among other things, that the debtor will receive between 16% and 25% from the net proceeds of the sale of certain real property belonging to Lone Star Partners as well as cash payments from Mr. Adams and Lone Star Partners. The December 19th Settlement Agreement also includes the following salient terms: (i) Lone Star Partners will sell the debtor 145 acres "pursuant to the option heretofore granted" under certain terms and conditions;[4] (ii) in

---

[4] Section 17.10 of the partnership agreement, which is entitled "Option to Purchase," provides as follows:

> William A. Taylor shall maintain the exclusive right and option to occupy and purchase a part of the partnership property for a price of $2,200 per acre for a period of 24 months from April 28, 1995. It is agreed that Taylor shall notify the partnership of his intent to exercise this option on or by September 1, 1995. It is further agreed that if Taylor elects to exercise this option, he shall be responsible for the interest accrued on that portion of the note from September 1, 1995 until he consummates the purchase and C. Kent Adams

MEMORANDUM OPINION AND ORDER – Page 6

exchange, the debtor will, among other things, release Mr. Adams from any claim asserted in the Malpractice Lawsuit and dismiss the Partnership Lawsuit with prejudice;[5] and (iii) the parties will "draft and sign more comprehensive documents to fully implement the purpose and intent of this Agreement not later than December 31, 2002."

Following the execution of the agreement, counsel for Mr. Adams drafted additional settlement documents and provided those documents to Kevin Buchanan, counsel for the debtor, on December 30, 2002.[6] The parties, however, were unable to agree on the contents of the documents. Thus, the parties did not formally announce the December 19th Settlement Agreement to the state court.

### C. Litigation Continues Despite the December 19th Settlement Agreement

On March 18, 2003, Mr. Adams filed a *Motion to Confirm and Compel Settlement* seeking to enforce the December 19th Settlement Agreement and to have the case dismissed. The hearing on the motion, which the debtor opposed, was postponed numerous times. On August 27, 2003, Mr. Hunter, as the attorney for the debtor, filed *Taylor's Response to Defendants' Amended Motion to Confirm and Compel Settlement and to Dismiss Action With Prejudice* in the Partnership Lawsuit. In that document, Mr. Hunter stated that "Taylor has withdrawn his approval" to the December 19th Settlement

---

shall then have the immediate right and option to purchase the same amount of acreage at the same price, and on the same terms and conditions as Taylor.

[5] The December 19th Settlement Agreement specifically provides that the debtor will release Mr. Adams from any claim which was asserted or which could have been asserted in the Partnership Lawsuit. The December 19th Settlement Agreement does not specifically address the Specific Performance Lawsuit, which had not been served on Mr. Adams at the time the agreement was executed.

[6] In hearings before this Court, Mr. Hunter complained that he did not receive the draft documents until after this date. Mr. Hunter, however, was not counsel of record for the debtor at the time the parties negotiated the December 19th Settlement Agreement. Although the debtor retained Mr. Hunter in December 2002 and Mr. Hunter was present during some of the negotiations as counsel for the debtor, Mr. Hunter did not become the debtor's counsel of record until March or April 2003.

Agreement, and he argued that the December 19th Settlement Agreement "cannot be enforced because it is incomplete as well as vague and/or ambiguous in material particulars . . . ." On the same day, Mr. Hunter filed *Taylor's Response to Defendants' Alternative Motion to Confirm and Compel Settlement and to Dismiss Action With Prejudice* in which he made substantially similar arguments.

A hearing on Mr. Adams' motion was finally held on August 28, 2003. At the hearing, counsel for the debtor presented a motion seeking to disqualify counsel for Mr. Adams. The court ruled that the parties were required to assert these issues at trial and directed the parties to another mediation session.

The trial of the Partnership Lawsuit has been continued several times at the debtor's request or as a result of the debtor's actions. Trial of the Partnership Lawsuit was originally set for October 2004 but was continued to March 21, 2005, based on the ill health of Mr. Hunter. The debtor filed a chapter 11 petition on the eve of the re-scheduled trial. The debtor then removed the Partnership Lawsuit to this Court, where it was assigned Adversary Proceeding Number 05-4178 and once again set for trial. On the eve of the trial of the Partnership Lawsuit in this Court, the debtor converted his chapter 11 case to a case under chapter 7 of the Bankruptcy Code. As a result of the conversion and the appointment of the trustee, the trial date was again continued. The trial of the Partnership Lawsuit is currently scheduled for November 21, 2006.

With respect to the debtor's status as a partner in Lone Star Partners, Mr. Adams contends that, prior to the debtor's bankruptcy, he terminated the debtor's partnership interest pursuant to the terms of the partnership agreement. The debtor, however, states in the Statement of Financial Affairs filed with this Court that he was a partner in Lone

Star Partners as of the date he filed for bankruptcy. Additionally, in his schedule of real property (Schedule A), the debtor lists a "claim to rural homestead in 145 acres or more...." In his schedule of exempt property (Schedule C), the debtor designates his "claim" to the 145 acres as his exempt property.

The debtor initiated several additional proceedings against Mr. Adams and Lone Star Partners in this Court prior to the conversion of his bankruptcy case. In Adversary Proceeding Number 05-4178, which the parties referred to as the "Declaratory Judgment Lawsuit," the debtor seeks to declare all sales of property made by Mr. Adams and Lone Star Partners after the date of his bankruptcy void. In Adversary Proceeding Number 05-4187, which the parties referred to as the "Injunction Lawsuit," the debtor seeks to enjoin Mr. Adams and Lone Star Partners from making any further sales of partnership property.

As of the hearing on the trustee's Bankruptcy Rule 9019 motion, the estate was holding $306,833.54 in cash received from the sale of the debtor's non-exempt real property. If the settlement agreement is approved, the trustee estimates administrative claims to be between $137,426.10 and $216,426.10, depending on the amount of estate taxes. The trustee estimates undisputed creditor's claims to be $181,360 and disputed creditor's claims to be $74,129.60 if the settlement agreement is approved and the claims filed by Buchanan & Burke, L.L.P. (in the amount of $240,000) and Mr. Adams and Lone Star Partners (in the amount of $361,873) are withdrawn. If the instant settlement agreement is approved, all creditors will be paid in full and the trustee estimates that the debtor will receive a surplus of at least $159,046.84.

## V. Analysis

Against this background, the Court assesses the probability of success in the

pending litigation and the paramount interest of creditors, giving due deference to the reasonable views of the creditors while considering the trustee's handicaps. *In re Cajun Elec. Power Co-op, Inc.*, 119 F.3d at 751. The Court also considers "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *In re Foster Mortgage Corp.*, 68 F.3d 914, 917, 918 (5th Cir. 1995) (internal citations omitted).

Here, there is no relationship between the trustee, Mr. Adams and Lone Star Partners. Counsel for the trustee met with present and former counsel for the debtor as well as counsel for Mr. Adams and Lone Star Partners to discuss the pending lawsuits. Because the parties had already spent several years and hundreds of thousands of dollars on the pending litigation, because the debtor filed for bankruptcy on the eve of the trial of the Partnership Lawsuit, and because the parties should have been substantially ready for trial, the trustee requested debtor and Mr. Adams to provide her with "position papers" in which the parties were to set forth their respective legal theories.

The "position papers" allowed the trustee to quickly discover the relevant facts and weigh the parties' legal arguments. After receiving the "position papers," the trustee rejected an initial settlement offer from Mr. Adams and Lone Star Partners as insufficient. Mr. Adams and Lone Star Partners thereafter made another offer and, after further negotiations, the parties reached the global settlement that is the subject of the instant motion. The Court finds that the proposed settlement is the product of arms-length bargaining and is not the result of collusion or fraud.

In evaluating whether the trustee, as the substitute plaintiff, would succeed in the pending litigation, the parties present several issues for the Court's consideration.

<u>MEMORANDUM OPINION AND ORDER</u> – Page 10

## A. The December 19th Settlement Agreement

The Objecting Parties assert that the global settlement should not be approved, because the matters have been previously settled by the December 19th Settlement Agreement. This argument contains two assumptions that are subject to material and significant litigation risk for the trustee and the estate. First, the Objecting Parties assume that the December 19th Settlement Agreement is enforceable. Second, the Objecting Parties assume that the debtor's version of the terms and conditions of the December 19th Settlement Agreement will be determined to be the agreement of the parties.

Although the debtor now contends that the December 19th Settlement Agreement is enforceable, he previously took a contrary position in the underlying litigation. In particular, Mr. Adams and Lone Star Partners filed numerous motions in the Partnership Lawsuit and the Malpractice Lawsuit seeking to enforce the December 19th Settlement Agreement.[7] The debtor opposed these motions, arguing, among other things, that the December 19th Settlement Agreement was not enforceable because (1) finalizing more complete settlement documents is a condition precedent to the enforceability of the December 19th Settlement Agreement, (2) the December 19th Settlement Agreement is vague as to material terms, and (3) he has withdrawn his consent to the settlement.[8]

---

[7] These motions include *Defendants' Amended Motion to Confirm and Compel Settlement and to Dismiss with Prejudice* filed on August 26, 2003, *Defendants' Motion to Cancel Plaintiff's Third Lis Pendens and For Sanctions* filed on October 15, 2003, and *Defendants' Motion to Determine Existence of Settlement Agreement; Motion to Realign the Parties and Motion to Allow Adams and Lone Star Partners to Open and Close* filed on October 6, 2004.

[8] Mr. Hunter elaborated on the debtor's argument at a hearing on an objection to the debtor's exemptions before this Court on August 17, 2005. Mr. Hunter testified that numerous issues were unresolved by the December 19th Settlement Agreement, including: (1) the definition of a "related party"; (2) the formulation of a procedure for the debtor to object to related party sales; (3) the treatment of sales proceeds pending an objection to the sale by the debtor; (4) who is to receive the debtor's survey of the 145 acres; and (5) how to apply the percentage fee to be paid to the debtor. The state courts in the Malpractice Lawsuit and the Partnership Lawsuit had not yet ruled on the motions to enforce the December 19th

Under Texas law, a settlement agreement satisfies the requirements of Rule 11 of the Texas Rules of Civil Procedure and may be enforced if it is in writing, signed and filed with the court or entered in open court prior to a party seeking enforcement. Where consent to the settlement has been revoked, the agreement may only be enforced as a written contract upon proper pleadings and proof. *See Mantas v. Fifth Court of Appeals,* 925 S.W.2d 656, 659 (Tex. 1996) *Padilla v. LaFrance,* 907 S.W.2d 454, 461 (Tex. 1995). A contract is valid and enforceable under Texas law upon a showing of "(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Hubbard v. Shankle,* 138 S.W.3d 474, 481 (Tex. App. - Ft. Worth 2004, writ den.). With respect to the enforceability of "agreements to agree," such agreements are enforceable under Texas law only if the agreement is "sufficiently definite in its terms so that a court can understand the promises made" and "all material terms of the contract" are agreed upon. *Geraghty and Miller, Inc. v. Conoco Inc.,* 234 F.3d 917, 930 (5th Cir. 2000).

In this case, the parties did not submit the December 19th Settlement Agreement to the state court and, therefore, the agreement is not a Rule 11 agreement under Texas law. To the extent one or both of the parties nonetheless seek to enforce all or portions of the December 19th Settlement Agreement as a matter of contract, the parties have expressed significant disagreement regarding its terms and conditions. Although the agreement was primarily intended to dispose of the pending lawsuits, Mr. Adams testified on August 17, 2005, that a dispute exists regarding whether the debtor needs to (or when

---

Settlement Agreement, or on the debtor's objections, when the debtor filed for bankruptcy on March 21, 2005

the debtor needs to) dismiss the pending lawsuits. Additionally, to the extent the December 19th Settlement Agreement relates to a transfer of real estate, the agreement fails to particularly describe the property, which may present an issue under the Texas Statute of Frauds. *See* TEX. BUS. COM. CODE §26.01(b)(4). Moreover, assuming that the debtor did not take a wholly frivolous position in his opposition to the enforcement of the December 19th Settlement Agreement in state court, a material litigation risk exists that the December 19th Settlement Agreement will be determined to be unenforceable under Texas law.

Even if the December 19th Settlement Agreement is determined to be enforceable as a contract or "agreement to agree" under Texas law, both parties had unperformed obligations under the December 19th Settlement Agreement at the time the debtor filed for bankruptcy, including the debtor's obligation to dismiss certain lawsuits and Mr. Adams' obligation to make certain payments to the debtor and to deliver certain contracts of sale to the debtor. A settlement agreement may be construed as an "executory contract" within the meaning of §365 of the Bankruptcy Code when there are unperformed obligations under the agreement at the time of bankruptcy. *See, e.g., In re Columbia Gas System Inc.,* 50 F.3d 233 (3rd Cir. 1995). Thus, in this case, there appears to be a risk that the December 19th Settlement Agreement will be determined to be an "executory contract."

An "executory contract" may be assumed or rejected pursuant to §365(a) of the Bankruptcy Code. However, in a chapter 7 case, the chapter 7 trustee must assume an executory contract within 60 days of the petition date or date of conversion, or the contract is deemed rejected. *See* 11 U.S.C. §§ 348(a) and 365(d)(1). In this case, since

the trustee did not assume the December 19th Settlement Agreement, there is a risk that the agreement will be deemed to have been rejected.

The rejection of an executory contract gives rise to a legal fiction that a breach of the contract occurred immediately prior to the filing of the petition. *See* 11 U.S.C. § 365(g)(1). Under Texas law, when a party to a contract fails to perform his obligations under the contract, he may not thereafter enforce the remaining terms of the contract. *See, e.g., Atl. Richfield Co. v. Long Trusts,* 860 S.W.2d 439, 447 (Tex.App. -- Texarkana 1993, writ den.). Thus, in summary, there is a material risk in this case that the December 19th Settlement Agreement will be determined to be a rejected, executory contract that the debtor may not now seek to enforce.

## B. The Financial Terms of the Settlement

Creditor Bill C. Hunter, P.C. objects that the proposed global settlement deprives the debtor "of significant assets and/or value." The debtor and Mrs. Taylor likewise argue that the settlement is too low.[9] In making this argument, Objecting Parties assert that the trustee is transferring realty to Adams and Lone Star Partners and, as such, the value of the realty must be considered in examining the financial terms of the settlement.

This objection is premised on a mischaracterization of the nature and scope of the estate's interest in the realty at issue here. The Bankruptcy Code provides that the commencement of a bankruptcy case --

> creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

---

[9] The debtor additionally objects that the trustee has not adequately described the mechanism by which the claim of Buchanan & Burke, L.L.P., will be withdrawn. However, the proposed global settlement agreement states that the claim will be withdrawn pursuant to a separate stipulation. At the hearing on the trustee's Bankruptcy Rule 9019 motion, Mr. Buchanan testified that Mr. Adams has agreed to purchase the claim of Buchanan & Burke, L.L.P., if the global settlement agreement is approved. Mr. Buchanan testified that he understood Mr. Adams would then waive that claim.

MEMORANDUM OPINION AND ORDER – Page 14

> (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case ....

11 U.S.C. §541(a)(1).  The Bankruptcy Code, however, does not determine the existence or scope of a debtor's interest in a given asset.  These threshold issues must be resolved by reference to state law.  *See, e.g., In re Farmers Markets, Inc.,* 792 F.2d 1400, 1402 (9th Cir. 1986); *Esselen Associates, Inc. v. Crysen/Montenay Energy Co.,* 102 B.R. 25, 28 (S.D.N.Y. 1989).  As the Supreme Court has explained, "[p]roperty interests are created and defined by state law," and "there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *See Butner v. United States,* 440 U.S. 48, 55 (1979).

In the present case, the debtor and Mr. Adams formed Lone Star Partners pursuant to Texas partnership law, and Lone Star Ranch is located in Texas.  The Court, therefore, looks to Texas law to determine the interest and rights of the estate in Lone Star Partners and Lone Star Ranch.

Prior to bankruptcy, the debtor had a partnership interest in Lone Star Partners, which Mr. Adams asserts he terminated pre-petition.  Upon the commencement of bankruptcy, the debtor's partnership interest, to the extent it had not been previously terminated by Mr. Adams, became property of the estate.  In addition, the debtor's causes of action against Mr. Adams and Lone Star Partners became property of the estate. However, the partnership's assets (*i.e.,* the realty) did not become property of the estate, because a partner does not have an ownership interest in partnership property under Texas law.  *See* TEX. BUS. ORG. CODE §§ 152.101, 154.001.  Lone Star Ranch is an asset of Lone Star Partners, not the debtor, and Lone Star Ranch did not become property of

**MEMORANDUM OPINION AND ORDER – Page 15**

the bankruptcy estate upon the debtor's filing of a bankruptcy petition.

The Objecting Parties assert that, notwithstanding the fact that the realty at issue here is partnership property, such realty became "property of the estate" as a result of the Fifth Circuit's decision in *In re Chesnut*, 422 F.3d 298 (5th Cir. 2005). In *Chesnut*, the Fifth Circuit considered whether a creditor violated the automatic stay by unilaterally foreclosing on realty in which the debtor asserted a community interest in property. The Fifth Circuit held that, even when the interest held by the estate was limited to an arguable interest, the automatic stay protects that limited interest such that a "creditor violates the stay if, without permission of the bankruptcy court, he forecloses on an asset to which the debtor has only an arguable claim of right." *Id.* at 300. Nothing in *Chesnut* expanded the underlying property rights of the debtor in the realty at issue in that case. The Bankruptcy Code does not create property interests that did not exist at the commencement of the case. *See, e.g., In re Burgess*, 392 F.3d 782, 787 (5th Cir. 2004). The Fifth Circuit in *Chesnut* merely held that creditors cannot adversely impact an arguable interest without first seeking a modification of the automatic stay imposed by §362(a) of the Bankruptcy Code.

At its core, the Objecting Parties' argument fails to distinguish between a determination that a particular interest is property of the estate and a determination of the nature and scope of the interest that became property of the estate. The former is governed by bankruptcy law, and the latter is determined by state law. Here, the interests to be transferred to Mr. Adams and Lone Star Partners are the estate's interest in the pending litigation, the estate's interest in causes of action against Mr. Adams and Lone Star Partners, and the estate's interest in the partnership. A valuation of the real estate

owned by Lone Star Partners is an improper measure of the value of the assets being transferred to Mr. Adams and Lone Star Partners under the proposed settlement agreement. Rather, the Court must look to the value of the debtor's partnership interest – which may have been terminated pre-petition – and the value of the pending lawsuits in light of the risks previously discussed.

### C. Mrs. Taylor's Belated Purchase Proposal

In her objection to the trustee's Bankruptcy Rule 9019 Motion, Mrs. Taylor asserts that the real property that is the subject of the Specific Performance Lawsuit is co-owned by her. Mrs. Taylor also asserts that she has an ownership interest in the debtor's right to performance under the December 19th Settlement Agreement. Mrs. Taylor, therefore, argues that she has certain rights in the debtor's property by virtue of §363(i) of the Bankruptcy Code. Section 363(i) requires that, before consummation of a sale of community property, the spouse be given the opportunity to purchase the property at the proposed sale price.

In a "supplement" to her objection, Mrs. Taylor seeks to use §363(i) to purchase a portion of Lone Star Ranch, which she refers to as an asset of her husband's bankruptcy estate. In particular, she proposes to pay the estate $450,000 and to assume $264,203.02 in claims made against the estate in exchange for, among other things, an unspecified 145 acres her husband has claimed as his exempt property in his bankruptcy schedules.[10] Mrs. Taylor states in her supplement that she has not yet obtained the requisite financing for the purchase.

The debtor's partnership interest, if any, in Lone Star Partners may be community property under Texas law. *See* TEX. BUS. ORG. CODE §154.001(b). The debtor, however,

---

[10] The debtor's Schedule C actually exempts a claim to the 145 acres, not the property itself.

is not a co-owner of the partnership's property. *See* TEX. BUS. ORG. CODE §154.001(c.). Under Texas law, "[a] partner **or a partner's spouse** does not have an interest in partnership property." *See* TEX. BUS. ORG. CODE §152.101 (emphasis added). Thus, Mrs. Taylor does not have any community property interest in any of the property owned by Lone Star Partners, and she does not have any rights in Lone Star Partners' property by virtue of §363(i) of the Bankruptcy Code.

In addition to her alleged rights under §363(i), Mrs. Taylor demands "adequate protection" from the trustee. A party that has an interest in the debtor's property may demand "adequate protection" pursuant to §363(e) of the Bankruptcy Code. A bankruptcy court may require "adequate protection" in order to protect an entity with an interest in property "from a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361.

Here, Mrs. Taylor appears to misunderstand the nature and purpose of "adequate protection" under the Bankruptcy Code. Mrs. Taylor demands a cash payment equaling the fair market value of 145 acres of Lone Star Ranch plus all amounts due and owing to her husband under the December 19th Settlement Agreement as adequate protection of her community property interest in her husband's assets. "Adequate protection," however, is not a means for obtaining payment of her husband's claims under the December 19th Settlement Agreement or their claim to property owned by Lone Star Partners.

Notwithstanding Mrs. Taylor's purchase proposal, the trustee seeks to go forward with the proposed settlement. It appears that the trustee has properly exercised her judgment and that the proposed settlement is in the best interest of the estate. The estate

does not own the 145 acres and, therefore, can not convey it to Mrs. Taylor. As discussed above, the trustee could convey only the estate's claims and causes of action. In addition, Mrs. Taylor's proposal is subject to a financing contingency, whereas the proposed settlement is not. Under these circumstances, it appears that the trustee properly exercised her judgment in pursuing the proposed settlement rather than Mrs. Taylor's last-minute proposal.

### D. Other Risks Associated with the Underlying Litigation

In the complaints and counterclaims filed in the pending litigation, Mr. Adams and the debtor tell very different stories. Among other things, Mr. Adams and the debtor disagree about whether the debtor was a client of Mr. Adams when they entered into the partnership agreement. Mr. Adams and the debtor accuse each other of converting partnership funds. Mr. Adams alleges that the debtor interfered with sales of the partnership property, while the debtor alleges that Mr. Adams blocked sales and delayed marketing of Lone Star Ranch. Additionally, the parties disagree about whether the debtor's partnership interest in Lone Star Partners has been properly terminated.

The trustee, in weighing the merits of litigation, noted that the debtor has avoided trying his claims against Mr. Adams and Lone Star Partners. The fact that the debtor, who is the plaintiff in the Partnership Lawsuit, has voluntarily acted to delay the trial of the Partnership Lawsuit on two occasions may support an inference that the debtor is not confident that he will succeed in a trial of his claims. Additionally, the debtor testified at the hearing on May 31, 2006, that he believed he would receive more under the December 19th Settlement Agreement than under the partnership agreement.

With respect to the Malpractice Lawsuit, the essence of the debtor's claim is that

the partnership agreement and related letter agreements are unfair to him and that, by entering into such agreements, Mr. Adams violated his duties under the Texas Rules of Professional Conduct. In prosecuting this action, the trustee must overcome Mr. Adams argument that the partnership agreement was fair and that cause existed to terminate the debtor's interests in the partnership. In light of the fact that a provision for the termination of a partner's interest in a partnership based on a payment default is a standard part of Texas partnership agreements, the trustee faces some litigation risk on the fairness issue. *See, e.g.,* 3 *S. Lee Stevenson,* TEXAS LEGAL PRACTICE FORMS § 16:5 (2d ed.) (form partnership agreement requiring contributions by partners and providing for termination of a partner's interest if the partner defaults in his obligations).

The partnership agreement contains clear and express provisions for the termination and forfeiture of a partner's interest in the partnership. It appears that Mr. Adams can make a prima facie case that he has terminated the debtor's partnership interest pursuant to the terms of the partnership agreement. While the debtor factually disputes Mr. Adam's position, the outcome of the trials of the Malpractice Lawsuit and Partnership Lawsuit will depend, in large part, on the Court's assessment of the credibility of Mr. Adams and the debtor.

Likewise, a trial of the Specific Performance Lawsuit will be factually intensive, and credibility will be an issue. There is also the question of Mrs. Taylor's standing to bring the action. Moreover, to prove that an alleged oral agreement to transfer property exists, the trustee will be required to introduce evidence regarding statements made more than ten years ago by and between the debtor, Mr. Adams and Lone Star Partners. The litigation risk for the trustee is heightened by the fact that the alleged oral agreement

MEMORANDUM OPINION AND ORDER – Page 20

conflicts with the written terms of the partnership agreement. The outcome of such a trial is highly speculative, which supports the global settlement proposed by the trustee.

### E. Complexity and Expense of the Pending Litigation

The proofs of claims filed against the debtor's estate include approximately $400,000 in legal fees incurred by the debtor in connection with the debtor's pre-petition litigation against Mr. Adams and Lone Star Partners. Additionally, the administrative claims against the debtor's estate include approximately $46,000 for the debtor's bankruptcy counsel and approximately $30,000 for counsel for the chapter 7 trustee. Counsel for the trustee estimated that, if the global settlement is not approved, the trustee's legal fees could exceed any recovery in the pending litigation and could deplete the funds the trustee is holding.

If the proposed global settlement is not approved, the trustee faces the prospect of protracted, complex and costly litigation. Mr. Adams and Lone Star have informed the trustee that they will appeal any adverse judgment. Further, the debtor appears to be highly litigious, at least in regard to Mr. Adams and Lone Star Partners. The history of the litigation between the parties' reveals that the parties are willing to spend huge amounts of time and sums of money and even to change their legal arguments for strategic reasons. Even the debtor's wife, whose standing is questionable, has sued Mr. Adams and Lone Star Partners to enforce an alleged oral agreement between her husband and Mr. Adams.

### F. The Interest of Creditors

On the other hand, the settlement the trustee asks this Court to approve would result in payment in full of administrative claims, payment in full of creditor's claims

**MEMORANDUM OPINION AND ORDER -- Page 21**

(including Mr. Hunter's claim for unpaid pre-petition attorneys' fees), and payment of a likely surplus to the debtor of between $159,046.84 and $238,046.84, depending on the outcome of several disputed claims and the amount of estate taxes. The trustee states in her Bankruptcy Rule 9019 motion that the settlement is "global" in the sense that it "is intended to ensure that Adams and Lone Star face no further claims by the [de]btor and/or his wife, if claiming through the [d]ebtor . . . ."[11] The global settlement would avoid the need for the trustee to retain additional litigation counsel and incur additional expenses in order to prosecute the pending proceedings against Mr. Adams and Lone Star Partners.

A settlement that will pay creditors in full, plus interest, is in the paramount interest of creditors. Where the litigation risk is material, as is the case here, it is not in the best interest of creditors to allow the debtor and his wife to gamble with the 100% distribution to creditors so that the debtor can pursue the underlying litigation in order to potentially increase the distribution he will receive. The trustee has received no other non-contingent offers that would result in the payment of creditors in full, and denial of the proposed global settlement would jeopardize the proposed payment to the debtor's creditors.

## VI. Conclusion

The responsibility of the bankruptcy judge . . . is not to decide the numerous questions of law and fact raised . . . but rather to canvass the issues and see whether the

---

[11] At the hearing on the trustee's motion, the debtor argued that the proposed settlement could impair his ability to defend himself in the pending dischargeability action filed by Mr. Adams and Lone Star Partners pursuant to 11 U.S.C. § 523. However, it is not clear that § 523 action -- in which Mr. Adams and Lone Star Partners seek to have their claims against the debtor determined nondischargeable -- can or will proceed once Mr. Adams and Lone Star Partners have withdrawn their claims against the debtor's estate.

settlement falls below the lowest point in the range of reasonableness. *See In re Imperial Tooling and Mfg., Inc.,* 314 B.R. 340, 342 (Bankr. N.D. Tex. 2004); *In re Pinnacle Brands, Inc.,* 259 B.R. 46, 54 (Bankr. D. Del. 2001) (citing *Newman v. Stein,* 464 F.2d 689, 693 (2nd Cir. 1972)). In this case, for all of the foregoing reasons, the Court finds and concludes that the proposed settlement is reasonable, fair and equitable, in the best interest of the bankruptcy estate, and meets the requirements set forth by the Fifth Circuit in *Jackson Brewing Company* and *Cajun Electric Power Co-op, Inc.* It is, therefore,

**ORDERED** that the chapter 7 trustee's "Motion to Approve Compromise and Settlement Agreement" shall be, and it is hereby, **GRANTED**.

Signed on September 29, 2006.

*Brenda T. Rhoades*

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE

MEMORANDUM OPINION AND ORDER – Page 23